Good morning, Your Honors. May it please the Court, Joanna Schiavone on behalf of Appellants East Bay Municipal Utility District and Craig Spencer. I'd like to reserve five minutes for rebuttal and I'll keep my eye on the clock. I plan to focus my argument today on three issues. First, for both plaintiffs, the retaliation verdicts are incompatible with the requirement under both Section 1983 and FEHA that there must be a materially adverse employment action. Second, as to Ms. Bland's constructive discharge claim, the law requires that any reasonable employee objectively would have felt they had no choice but to resign. The law speaks of coercion and compulsion. Test is not whether resigning from the job was simply one rational option. Ms. Bland has not met that high bar here. Third, Ms. Pierce's cat's paw theory is not sustainable. Mr. Spencer made comments in the context of a confidential internal investigation. While Ms. Pierce claims that Mr. Spencer knew the report would be sent to the board, there's no evidence of that and they argued contrary in closing. Instead, it was Ms. Pierce herself who was the catalyst for sharing the information and that is not how cat's paw liability is applied in California. And counsel, let's assume that we would agree that there was a failure of sufficient proof on the cat's paw theory for one reason or another. What is the impact on the verdict of that conclusion, especially in light of the general verdict form? Thank you, Your Honor. It's our contention that with respect to, so there's two categories of adverse employment actions, I guess three, her argument about delay, her argument about course of conduct, and then the cat's paw theory with respect to EB Mudd. And it's our contention that if the court were to reverse on that as an unsustainable theory insufficiently supported by the evidence, that the court would need to reverse but upheld another adverse employment action, that the court would need to reverse the damages verdict with respect at non-economic damages. And even though there was a general verdict, we've cited in our briefs the case law that that reversal would be required because I think it's the Maynard case, the court reversed the section 1983 and 1985 causes of action even though there was no, there was a general verdict. And when one theory of liability, it's a theory of liability, and when that theory of liability is reversed, the non-economic damage board would be unsustainable. Does that apply only as to EB Mudd? Since the cat's paw theory, as I understand it, is only applicable to the utility. It's also our contention, Your Honor, that because there would be, for the same reason there's also a failure of proof of direct liability by Mr. Spencer for the same reason that he was not the party acting with animus. And so that's also alleged as a direct theory of liability against Mr. Spencer under Section 1983. And so to the extent that the failure of proof is with respect to the acting with direct retaliatory animus to impact that later decision, that that would also mean that that theory is not sustainable. But the cat's paw theory, as the traditional cat's paw theory to influence the board as decision makers, you're correct that that is against EB Mudd only. And so it's at least theoretically possible to find insufficient proof on the cat's paw theory, thereby requiring reversal of the verdict as to EB Mudd, but sustaining it as to Spencer? Our contention is that it would also require reversing the verdict as to Mr. Spencer on the Section 1983 unless the court found a different, was sustaining it on some different theory. But with respect to that, if the insufficiency of the evidence that he acted with animus directly, then that would not sustain the Section 1983 claim as well on the direct theory of liability for Mr. Spencer. And the other case that I intended to cite was also the Coastal Abstract case. It's both Maynard and Coastal Abstract under which the court says, even when it's a general liability, where there's actually non-liability, the damages verdict, the damages award needs to be reversed and remanded for a retrial on damages. And that was a Lanham-Atclay case, as I discussed, Maynard was the Section 1983 and 1985 race discrimination claim where the court found insufficient evidence of those race discrimination claims and it couldn't be separated out from retaliation, and so the damages award was reversed and remanded. So can I ask you to come back? So I think your very first point was there's insufficient evidence of adverse action. I take it that that depends on us agreeing with you on your second point about the constructive discharge because if there was a constructive discharge, that would be adverse action, right? So I have a couple of responses to that question, Judge Miller, and the first response is that's not as the case with respect to Ms. Bland. It's not the case that was presented to the jury. It's not how it was argued in closing argument. And our contention on that is that legally, it's not proper to do that here because with respect to constructive discharge, we concede that more of the evidence may be considered in terms of a timeline, but that would just be a way of bootstrapping in pre-complaint conduct into the retaliation claim. And so it's only proper to consider the conduct for retaliation from April 2020 to her resignation and leaving EVMUD in November of 2020. But if her claim on constructive discharge, we also have some arguments that the race discrimination facts shouldn't be considered. But if you consider those facts, and then if you consider constructive discharge, it's a way of bootstrapping that in. And the law is very clear that pre-complaint conduct can't be the basis for retaliation. And what was the, how was the jury instructed on when the conduct had to take place? Was it instructed on the issue you're just addressing? I'm not, it's not coming immediately to mind, but what I can say that because this is a legal issue. So I think what the court under Burlington Northern, this is, the question is whether, whether as a matter of law, there is an adverse employment action. And so. Counsel, maybe I can perhaps assist a little bit. Wasn't there a jury instruction, standard jury instruction that the complaint had to be a substantial motivating reason for the adverse action? Yes, that was part of the jury instructions, Your Honor. I was trying to think about the timeline. Well, is that not relevant to timing? So the timing question, though, is for this court, because under Burlington Northern and the other cases that say that you can't have pre-complaint conduct, the question is whether the conduct that occurred for retaliation only, I'm not talking about constructive discharge, but with respect to retaliation only, post-complaint, was there an adverse employment action? And so, and so again, the response on the constructive discharge is it would be a way to bootstrap in that conduct before if she's arguing for the pre-complaint conduct. Well, how could pre-complaint conduct substantially be a substantial motivating reason if it predates the complaint itself? Only if, if the constructive discharge is what's used as the anchoring adverse employment action for, for the retaliation claim. Right. Isn't that the basic question here? I mean, constructive discharge is an adverse employment action. And so, and in constructive discharge, you can take pre-complaint actions into consideration. So why isn't constructive discharge enough to show an adverse? So, I think what I would, what I would respond on that is if we're turning then to constructive discharge to talk about the sustainability of that as a legal matter, the question is that... No, I get that. But the question is, do you agree with the logic that if, if it's a constructive discharge is an adverse employment action, and in determining constructive discharge, you can take pre-complaint conduct into consideration? I only agree, I agree with the logic, your honor, to the extent that it seems, number one, it wasn't the theory that was, that was argued here when it was, when it was argued. The case was presented, presented below. It was the first time that's ever been raised was, was on appeal. But the, but the second response to that is, again, it seems like a way to bring in conduct that, that predated retaliation. And so, so I guess that's my, my, my best answer on, on that point. And so I guess turning then to constructive discharge, I think it's also important to focus in because not all of those facts, it's our contention that not all of the facts argued can be considered on constructive discharge either. With respect, and in Ms. Bland's brief, in particular, she relies on the medical leave related facts, discrimination regarding her medical leave and not respecting the medical leave reduced workload and increasing a workload. But because she did not prevail on the CFRA claim, those facts actually are not proper to be considered with respect to, to either, either claim for relief that's under the Schaeffer case. It's also our contention that an extension of Schaeffer is that because she did not prevail on the race discrimination claims, that those facts have to be read, that those facts can't be read in the light most favorable to her. The, the Schaeffer case states that, that the facts on, with respect to a mixed, a mixed verdict, and I realize it's not a deadlock in the Schaeffer case, but it is a mixed verdict case. And what the, what the, what this court said was when the jury's verdict is split, we draw all factual inferences and resolve all issues of credibility in favor of the jury's findings. Because Ms. Bland bore the burden of proof on each of the three race discrimination claims, did not prevail on those. It's our contention that you, that it's not proper for this court to consider all of those race discrimination facts in analyzing whether there was sufficient evidence of a constructive discharge. And so I think that those two things are closely related, Your Honor, but, but even if, even assuming that a constructive discharge could be an adverse employment action, it's those, the facts, it's not proper then to bootstrap all of those facts into a retaliation claim, I think is our, our essential argument on that. And I think with that, are there further questions or I'm happy to reserve. Before you run out of time, I wonder if you could briefly address Ms. Duffy, the expert. I mean, I think you may have a strong argument that that expert testimony was improper, but I'm wondering what your argument is that it was prejudicial. Yes. So turning then to the, to the prejudice argument, Your Honor, you know, the, the response on that point was that it's, it was brief, but our response to that is, but it featured prominently in the trial. Everything built up to that and it featured in, in counsel's closing argument with, with respect to every cause of action, it was hammered over and over. It was used to undermine the, the defendants at every stage, the, with respect to the investigations, with respect to commenting on evidence and drawing, commenting essentially on Mr. Spencer's credibility, drawing on inconsistencies between performance evaluations, what he said in performance evaluations and comments he made inside the investigation. The expert commented on that as well. It featured in all of the causes of all the claims for relief on which the plaintiffs prevailed. And, and under Barabin, this court's decision in Barabin, it's not our burden to establish that the harm, it's the, the opponent's burden to establish harmlessness. And as we, as we know, often it matters who bears the burden of proof with respect to showing harm. And so even though it may have only been half an hour of testimony, it was absolutely critical to, to the plaintiff's case, not just in establishing the failure to prevent claim, but with respect to each of the claims of retaliation and, and constructive discharge. It was used, as I said, to undermine every single aspect of, of the, of the defendant's decision-making, investigation, progress of, of how they handled all of this, all of the conduct at issue. Okay. I'll, I'll reserve. Oh. And, and just, just quickly, if you could refresh my memory, there was a defense in limine motion to exclude all evidence of the investigation. Not of the, there was a defense motion in limine to exclude the expert testimony as presented in her expert report. I'm, I am sorry if I misunderstood the question. So no, you didn't. So the in limine motion was simply focused on Ms. Duffy, but was there any effort by the defense to exclude any evidence of the investigation and the results of the investigation? There was, there was litigation of, of a particular aspect of whether the statements from the investigation could be used. There was an argument under 47B, under the civil code 47B. And so that was the focus of that. But the defendants waived the, waived privilege with respect to the investigations and they were part of the case and they were admitted. And so to the extent that the defense is relying in part or not objecting to the inclusion of the results of the investigation, because it perhaps assists them. Why isn't it fair then? And why doesn't it open the door to the type of evidence that was presented by Ms. Duffy? So I think my response on that is sort of twofold, Your Honor. Number one, even, even if there, even if there could be a door opening argument with respect to an expert, the district court, as you well know, still needs to perform its analysis of the gatekeeping step. And so the central part, I think, of our initial contention is that the, the sort of very abbreviated analysis is much closer to the Barabin circumstance where the court didn't undertake a gatekeeping analysis. And I think this court's reasoned decision in Engelis indicates that the court really needs to scrutinize the factual basis for those excerpt opinions that are offered. And are they being reliably applied to the facts in this case? And it's our contention that at that gatekeeping step, that, that simply, that analysis wasn't done. You may be right with respect to the gatekeeping portion, but what about the prejudice portion? So the court's, or my question really focuses on, primarily on prejudice once that door is opened and you're attempting to rely upon that evidence. But even if, even if there is, so the, and the investigators did come as, as percipient witnesses, but, but, but even under this court's case law. So for example, in Stop Staring, the court granted a new trial where there was improper expert testimony, where witness credibility was a central issue. And that's really our contention here is that if we are successful in persuading the court that the gatekeeping step, that there was a failure at the gatekeeping step, then there really was prejudice here because of each element that, that Ms. Duffy commented on. And I think I would also go back to our arguments that she also invaded the province of the jury and, and offered legal conclusions improperly. So that's another, I think it folds in to the prejudice. I think it's undisputable with respect to the failure to prevent claim. She told the jury exactly what conclusion to reach, that, that's improper. And then we've made our arguments that she weighed in on improper issues, that all rolls up into prejudice. All right. Thank you. Thank you. Ms. Albers. Good morning, your honors. May it please the court, Wendy Albers for plaintiff and appellee Arielle Bland. I'd like to address the district's argument on how you view the evidence in this case. The district wants this court to ignore evidence that supports the jury's verdict, to sweep it under the rug, under the guise it is not relevant because Ms. Bland did not prevail on all of her employment claims. But that is not how the substantial evidence standard works. When you have related causes of action, just as the jury was instructed to consider the claim separately, the evidence has to be viewed separately and the jury's verdict reviewed based on all of the evidence that supports the claims on which Ms. Bland prevailed in the light most favorable to her. The Schaefer case cited by the district, in that case there were distinct claims with no overlapping facts. The jury's finding that the deputy used excessive force was not based on the same facts that supported the jury's finding that the deputy had probable cause for the arrest. Here the facts are not necessarily tied to just one cause of action alone, but can support multiple related claims. Additionally, the district's argument that any evidence that predated the protected activity cannot support a continuous pattern of conduct for constructive discharge is contrary to California law. Evidence of discriminatory treatment, though it did not win the day with the jury on her discrimination claims, can be considered in reviewing the jury's finding of constructive discharge. Thompson v. Tractor Flight Systems addresses this issue head-on. It holds that the accumulation of discriminatory treatment over time can amount to intolerable working conditions even if some of that evidence occurred prior to the protected activity. But, so how can, I mean, but if the theory is that the constructive discharge is the adverse action and the adverse action has to be caused by or have some causal relationship to retaliation, how can you have that causal relationship if some substantial part of the things that constituted the constructive discharge happened before the complaint that was being retaliated, that prompted the retaliation? Well, the constructive discharge happened after the protected activity, and so that is the adverse employment action that happened after. While there may have been some evidence before the protected activity that led to the decision or a reasonable person's decision to resign, that is part of the consideration of constructive discharge. But, I mean, suppose, I mean, suppose you have a case where, you know, the employer does, you know, all kinds of horrible things to the employee, you know, leading up to, you know, February 10th. You know, on February 11th, the employee files a complaint of something. On February 12th, the employee says, you know, all this stuff happened to me over the past, you know, year, and it was terrible, and I'm now quitting. I've been constructively discharged. Like, it seems very strange to say that that constructive discharge was caused by, you know, retaliation for the complaint that happened the day before. I mean, I think under your scenario, yes, because it's so close in time, but here you don't have that. You have a complaint in April, and then what was a bad situation, after the complaint and the retaliation, it turned it into an intolerable one. That you have to look at the entire employment context. You can't just look at what happened after she complained, because you want to see where it was at the time she complained, and did that complaint make it worse. But I guess, so you're agreeing that at least something has to happen after the complaint, right? Something has to happen to show the conditions, you know, you had a bad situation, and now all of a sudden, you had a situation that became worse because of the complaint. And in your view, does the, I mean, Judge Blumenfeld mentioned the sort of the general instruction given to the jury that they had to find causation. Do you think that's adequate to allow us to infer that they must have found that something relevant happened after the complaint took place? Yes, I do. And there were additional adverse actions besides the constructive discharge as well, such as downgrading the responsibilities that she had performed her first year in her performance evaluation, telling her that she was, didn't have the skill set to be promoted to the next level of an attorney. You know, an abertus and workload was imposed when she was returning from medical leave. And again, the district cannot exclude that evidence, simply because she did not prevail on her claim for violation of the California Family Rights Act. The fact she didn't prevail on that claim does not mean the jury found that she was not subjected to a retaliatory workload, because that claim had different elements that we don't know what the jury, why it did not find in her favor on that claim. Ms. Albers, let me just make sure that I understand your position in light of your response to Judge Miller. Let's assume that the jury did, in fact, rely upon pre-April 2020 evidence in concluding that there was retaliation related to the April 2020 complaint. Does the retaliation verdict still stand? Yes. Why? Because it's clear, and again, I would point the court to the Thompson case, because that case, the jury was entitled to consider evidence of mistreatment in the workplace that predated the protected activity to find a continuous pattern of conduct, which ultimately led to constructive discharge. And that case was similar to this case in that the employee in Thompson alleged constructive discharge based on discrimination and retaliation, and the jury returned to special verdict finding no discrimination, but found constructive discharge and retaliation. Ms. Albers, doesn't that position require us essentially to reshape the basic concept of causation? Causation is a relationship between one act and another. It is, Your Honor. But I think what the law, what California law is on this issue is that you have a bad employment relationship. You have a bad situation where you've been subjected to some discriminatory treatment, and then you complain about that treatment. And then it gets worse. So that's your causation. And then it gets worse to the point that it's so intolerable that the employee feels that there's no other choice but to resign. So there is a causal link there, but you're just allowed, you don't take the employment situation as it existed at the time you filed the protected complaint. You can consider what happened before, and that is the holding in the Thompson case. And then I want to briefly discuss the issue of the misability of Duffy's testimony in this case. The district court has considerable discretion in admitting expert testimony, and Duffy's testimony in this case was proper. However, any purported error there may have been was harmless here because you have other witnesses who testified to the perceived deficiencies with the investigations, including reimbursement of Mr. Spencer's legal fees that gave the perception of bias. For example, you had Dorian West Blair, who was the diversity and inclusion officer at the district and oversaw discrimination complaints at the district, and she was an experienced workplace investigator. She testified that she did not find the investigations fair and impartial and believed rank and file employees were at a disadvantage in addressing discrimination and retaliation issues with upper management. And did she state, I mean, one of the things that I think is particularly questionable about Ms. Duffy is, you know, she's asked the question, you know, can you provide examples of what, in your opinion, reflects bias? And she stated the conclusion that the investigation was biased. Did Ms. Blair state that conclusion as well? She stated that paying for the attorney's fees for Mr. Spencer gave the perception of bias and that there was, her quote, that there was a side being chosen. Other employees also testified that the district did not handle complaints of disparate treatment fairly based on their observations. And finally, even if you find Duffy provided any improper legal opinion, she admonished the jury not to defer to her expert opinion, but to rely on their own assessment of credibility and that their decision could contradict what she has told them. So she didn't tell the jury how to rule. She told the jury, based on her opinions and her assessment and federal and state guidelines, what was wrong with the investigation. Thank you. Thank you. Mr. Rubin. Thank you. May it please the court. Michael Rubin on behalf of Saji Pierce. For Ms. Pierce, who was an 18-year veteran of the district's general counsel office, who had received consistently superlative performance evaluations through the tenure of three general counsels, including, since 2015, Craig Spencer, everything changed in March 2019 when she engaged in protected conduct, submitting a complaint as she was obligated to do under East Bay Mudd's policies and under FEHA because she reasonably believed that there was race discrimination that permeated the general counsel's hiring decisions. As of March 2019, what had been an enormously successful career with an extremely bright future all of a sudden turned because Craig Spencer and East Bay Mudd, the employer, turned against her and made it difficult, if not impossible, for her to perform her job effectively and on several occasions denied her advancement, which is the essence of an adverse employment action. The legal standards aren't in dispute with respect to Ms. Pierce. The jury unanimously found prescribed retaliation against both Mr. Spencer under Section 1983 and the district under FEHA and awarded her emotional distress damages as well as economic damages based upon the interference with her promotional opportunities. What the record shows is an escalating series of adverse actions, none of which preceded March 2019, all of which intensified after March 2019 and then again when she filed the complaint in April 2020 after April 2020. Now the first of the more extreme retaliatory acts had to do with the denial of the opportunity to be promoted to assistant general counsel, a position for which she was eminently well-qualified, the most experienced in the past, according to the evidence. Promotions have been based exclusively on seniority. There's a dispute about that, but the jury is entitled to resolve that dispute in favor of Ms. Pierce. Instead of opening up the position once the prior assistant general counsel resigned, Mr. Spencer decided to hold the position open for 13 months and he expressly said that the reason was he wanted to give other potential candidates the opportunity to meet the basic minimum qualifications that Ms. Pierce had already satisfied. That's unlawful retaliation. In addition, he put his thumb on the scale. He drafted the job qualifications. He drafted the questions for the persons being interviewed for that position. So he made it impossible for her to get that position. At the same time, Ms. Pierce found, and this goes to the cat's paw evidence, the underlying evidence, that when the investigation into the first and then again the second complaint that Ms. Pierce filed was being conducted, even though he had given consistently superlative performance evaluations of Ms. Pierce, he accused her of all sorts of wrongdoing, of blackmail, of plagiarism, of being a poor communicator, of having no communication skills, all inconsistent with what had been in the record torpedoing her opportunity both to become assistant general counsel and then later, when Mr. Spencer himself retired in January 2021, further advancement to the general counsel position. All of these acts of retaliation, all dating from March 2019, are the responsibility, as the jury found, of both Mr. Spencer and East Bay Mudd. They are both liable. There was one jury verdict form. The determination of damages was as to both of them for the 1983 violation and the FEHA violation. So how do you deal with Brooks and Chen in the context of refusing or delaying the opening of the position? I mean, Brooks seems to say, well, I'll quote it, it says, we've held that declining to hold a job open for an employee and badmouthing an employee outside the job reference context do not constitute adverse employment action. Right. He, we, as we pointed out in our briefs, Ms. Pierce's situation is the exact opposite. She's not complaining that they didn't hold the job open for her until she could become qualified. She was complaining that her complaint is, and the jury necessarily found, that she was qualified, she was senior, she was experienced, she would have been a shoe-in, but for the fact that he wouldn't open the job up for 13 months, in the meantime, continued to retaliate, continued to badmouth, and rigged it so she wouldn't get the position. So Brooks is the exact opposite situation. The question, and it can be a factual dispute, why did he do it? And that's up to the jury to decide, as most all of the issues that arise in this case. The jury determined, necessarily, that the reason he did it was because she had complained about him. Because she had complained about racial discrimination in the general counsel's office. And that's why he held the job open and didn't promote her. Now turning to the cat's paw. Well, before we leave that, so what I gather, your general theory is a denial of promotional opportunities, not necessarily the specific holding that declining to open up the job, right? Right, right. But for the retaliatory conduct, it's a substantial motivating factor, she would have been the assistant general counsel. And likewise, after Spencer retired, she would have been the general counsel the jury found. Now, cat's paw. First, I want to emphasize that cat's paw is only one of the theories that supports our position that there was unlawful retaliation by not promoting her to general counsel. Recall that there were three board members that made the decision not to advance her to the second round of interviews for the general counsel position. The president of the board at the time, Marguerite Young, testified, and this is 9ER, page 1805 and 1822, that she believed that Sagi Pierce should not be promoted to general counsel because Pierce, by filing the two complaints, the two legally protected complaints of race discrimination and retaliation was hurting morale, was showing poor leadership, had caused a large amount of discomfort within the general counsel's office, even though the East Bay MUDS policy required her to file those complaints if she had a reasonable belief that there was race discrimination. Similarly, Derek McDonald, who was the one who was ultimately appointed as the general counsel, said when he was before the committee that made the decision that he should be appointed rather than Ms. Pierce, and this is in 10ER, 201-36-37, because he would be able to restore trust and rebuild morale that had been lost due to Ms. Pierce's complaints, her legally protected complaints. So even without cat's paw, there is sufficient evidence to support the jury's verdict under the highly deferential standard that applies. But the cat's paw is admissible evidence. We explained in the brief five different reasons why the litigation privilege would not preclude that evidence from being presented to the jury. I can go through those five reasons if you like, but there's no question that Ms. Young testified that the reports, in particular the second investigation report, was in the one drive of the materials presented to those three board members who made the decision whether to advance Ms. Pierce to the second round of interviews, and those are the interview And she said that every member of the board had them available and she assumed that everyone reviewed them, which the jury was entitled to draw the reasonable inference that the board members did their job and in fact reviewed the evidence that was presented to them that accused her of blackmail, that accused her of plagiarism, and all these other factors. So given the highly deferential standard of review that applies to a jury decision, the emotional distress damages, the punitive damages, the economic damages, all of which flowed from a course of conduct, not communications. And the Westlake case, Justice Debriner's opinion in the California Supreme Court clearly draws that distinction for purposes of litigation privilege. But the entire course of conduct for which both defendants are responsible sufficiently supports the jury's verdict that the verdict as to Ms. Pierce should be affirmed in its entirety. Thank you, Counsel. Thank you. Rebuttal. Thank you, Your Honor. I'll just make three quick points on some of the issues that came up. First, to return to the harmless error question, in this court's decision in Rincon, the court recognized that the powerful nature of expert testimony coupled with its potential to mislead the jury. And I would draw the court's attention to the closing argument at 17 E.R. 3670-81, where counsel argued that Duffy's testimony showed bias, as Judge Miller pointed out, biased workplace investigations, E.B. Mudd's tolerance of discrimination and retaliation by Spencer, quote, with impunity. They argued that all of the investigations, every one of them was poisoned, none of them was worth the paper they're written on, argued that the jury should disregard the findings in all three investigations, and then hammered and drew the jury's attention to Duffy on each of the claims. And you'll see that throughout the closing. With respect to Ms. Pierce, since we didn't discuss that much in opening, I'd just like to quickly respond to counsel's points that on the non-catspaw theory, Judge Thomas, as you indicated, under this court's decision in Brooks, a delay cannot be deemed retaliatory where it affected everyone equally. And here the job was to be an open recruitment. Recruitments for assistant general counsel positions were always open recruitments. The claim that it was merely a promotion, that she was merely entitled to the job, simply isn't accurate. Positions were posted internally and externally, a variety of candidates would be invited to apply, and in fact, Ms. Pierce did apply, and then withdrew her application in the fall at the time that she resigned, and the jury, as you know, rejected her constructive discharge claim. So it's our position that you've drawn the right analogy to Brooks and also to the Chen case involving an attorney, and that that was not an adverse employment action. Mr. Spencer's decision merely to wait and see the timing of how the department was going to shake out in the wake of Ms. Berry's retirement. She had been a longtime attorney. There already was a second assistant general counsel, and so that delay, it applied to everyone equally. It wasn't targeted at Ms. Pierce. And finally, on the catspaw theory, just a couple of quick points. The California law requires that a person with retaliatory animus be a significant participant in that decision, or that the board members were mere instrumentalities, and that is the evidentiary defect that we believe exists in this case. I believe it's an over-reading of the record to say that President Young, that there's a fair inference that President Young said other board members had access to the document and reviewed it. What she testified to was that she had access to it, she reviewed it, and she actually said she didn't know about the other board members, though she did assume board members came to meetings prepared. It wasn't an email on which everyone was copied. She didn't testify with any certainty on that point. Ms. Schiavone, Mr. Rubin also said that Ms. Young made some disparaging comments about Ms. Pierce and her filing of these complaints. So first of all, please respond as to whether Mr. Rubin's description of the record is accurate, and if it is substantially accurate, its legal implication. It's our contention, Your Honor, that that is also an over-reading of the record. What Board Member Young testified to was that she had wanted Ms. Pierce to perform well. Coming into the interview, she had always thought she was a competent and capable employee, and in the interview, she used a lot of I statements. She talked about I did this, I did that, and that she didn't view that as being a team player, and what they needed was someone who could lead the office in a fashion to work with everyone. And so it came up in the context of her responses in the interview, not directly tying it to Mr. Rubin's articulation made it seem as though she tied it directly to the filing of prior complaints. I don't think that that's a fair reading of the record or an inference that the jury would be entitled to draw from that testimony from Director Young. All right. Thank you. Thank you. We thank all counsel for their helpful arguments and the cases submitted.
judges: THOMAS, MILLER, Blumenfeld